IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 05-00298-01-CR-W-ODS |
| | ) | |
| Plaintiff, | ) | COUNT ONE |
| | ) | |
| v. | ) | Conspiracy to Sell Counterfeit |
| | ) | and Illegally Imported Drugs |
| MARIA EUGENIA MEDINA MILGROM, | ) | |
| a/k/a MARIA EUGENIA MEDINA, | ) | 18 U.S.C. § 371 |
| a/k/a GENIE MEDINA, | ) | NMT 5 Years Imprisonment |
| [DOB XX/XX/1955], | ) | NMT $250,000 Fine |
| | ) | NMT 3 years supervised release |
| Defendant. | ) | $100 Special Assessment |
| | ) | Order of Restitution |
| | ) | Class E felony |

I N F O R M A T I O N

THE UNITED STATES ATTORNEY CHARGES THAT:

COUNT ONE

(Conspiracy to Sell Counterfeit and Illegally Imported Drugs)

Background

At all times material and relevant to this Information:

1. Lipitor was a prescription drug product that had been approved by the United States Food and Drug Administration (FDA) for distribution within the United States.

2. Pfizer Ireland Pharmaceuticals and Pfizer, Inc. (Pfizer) had and has the exclusive lawful right to manufacture Lipitor for distribution within the United States.

Pfizer also manufactures other versions of Lipitor for distribution in countries other than the United States. These foreign versions of Lipitor are not approved for sale or distribution in the United States.

3. The name "Lipitor" was and is a trademark owned by Pfizer and is registered on the principal register in the United States Patent and Trademark Office.

## The Conspiracy and Its Objects

4. Beginning at a time unknown, but by no later than on or about February 2002, and continuing until at least on or about April 2003, in Kansas City, Jackson County, within the Western District of Missouri and elsewhere, defendant MARIA EUGENIA MEDINA MILGROM did unlawfully, willfully and knowingly combine, conspire and agree with others known and unknown to: (a) commit offenses against the United States, that is, sell counterfeit, misbranded, and illegally imported drugs, in violation of the Federal Food, Drug and Cosmetic Act, Title 21, United States Code, Sections 301 et seq., and (b) defraud the FDA and the United States Customs Service, both of which are agencies of the United States.

5. To effect the purpose of the conspiracy, its members, by mutual agreement and with the intent to defraud and mislead, would and did: cause the manufacture, importation, and labeling of certain drug products; cause the misbranding and counterfeiting of certain drug products; and sell certain misbranded and counterfeited drug products.

## Manner and Means By Which The Conspiracy Was Carried Out

6. The members of the conspiracy used various manners and means to effect the object and purpose of the conspiracy, including but not limited to the following:

    a. It was a part of the conspiracy that its members would and did cause genuine Lipitor tablets not intended or approved for sale in the United States to be illegally imported into the United States ("illegally imported tablets" or "diverted tablets") by, among other things, making false and fraudulent representations to the United States Customs Service.

    b. It was further a part of the conspiracy that its members would and did purchase various chemicals to be used in manufacturing counterfeit tablets intended to be similar to genuine Lipitor tablets.

    c. It was further part of the conspiracy that its members would and did purchase punches and dies to be used in manufacturing counterfeit tablets intended to be similar to genuine Lipitor tablets.

    d. It was further a part of the conspiracy that its members would and did ship said punches, dies, and chemicals to locations outside the United States for the purpose of setting up a drug manufacturing facility in a foreign country.

    e. It was further a part of the conspiracy that its members would and did cause the manufacture, in a foreign country, of counterfeit tablets similar to genuine Lipitor tablets ("counterfeit tablets").

f.  It was further a part of the conspiracy that its members would and did cause the importation of said counterfeit tablets into the United States by, among other things, making false and fraudulent representations to the United States Customs Service.

g.  It was further a part of the conspiracy that its members shipped the counterfeit and illegally imported tablets to the United States with instructions to transship said tablets to a foreign country.

h.  It was further a part of the conspiracy that instead of taking the counterfeit and illegally imported tablets to a bonded warehouse after they arrived in the United States, the members of the conspiracy would cause said tablets to be transported to a location other than a bonded warehouse, knowing that said tablets would be removed from their shipping containers and replaced with Epsom salts, and the shipping containers, now holding Epsom salts, would be delivered to a bonded warehouse for shipment to a foreign country.

i.  It was further a part of the conspiracy that its members would and did travel to foreign countries in connection with the illegal manufacture and illegal importation of said counterfeit, illegally imported, and diverted tablets.

j.  It was further a part of the conspiracy that its members would and did cause the manufacture in the United States of counterfeit labels that were intended to be similar to the genuine labels on bottles containing genuine Lipitor tablets.

k. It was further a part of the conspiracy that its members would and did create false invoices and pedigrees to conceal the true nature of the counterfeit, misbranded, illegally imported, and diverted tablets and to prevent their detection as counterfeit, misbranded, illegally imported, and diverted tablets.

l. It was further a part of the conspiracy that its members would and did sell and attempt to sell the counterfeit, misbranded, illegally imported, and diverted tablets to drug wholesalers in the United States.

m. It was further a part of the conspiracy that its members would and did defraud the FDA by selling the counterfeit, misbranded, illegally imported, and diverted tablets in the United States as genuine Lipitor tablets intended and approved for sale in the United States.

### Overt Acts

7. In furtherance of the conspiracy to traffic in counterfeit, misbranded, and illegally imported drugs and to accomplish the objects of the conspiracy, one or more members of the conspiracy committed and caused to be committed various overt acts within the Western District of Missouri and elsewhere, including, but not limited to, the following:

a. On or about June 2002, defendant Maria Eugenia Medina Milgrom, acting through Farma International, a corporate entity which she controlled, sold to various members of the conspiracy the excipients needed to manufacture

counterfeit Lipitor and then caused the excipients to be shipped to a location in Costa Rica.

   b. On or about August 2002, defendant Maria Eugenia Medina Milgrom, acting through Farma International, a corporate entity which she controlled, and at the direction of other members of the conspiracy, participated in the purchase from a St. Louis, Missouri area company of the punches and dies needed to manufacture 10 mg. and 20 mg. counterfeit Lipitor tablets.

   c. On or about September 2002, various members of the conspiracy caused said punches and dies purchased from the St. Louis, Missouri area company to be shipped to Costa Rica via Miami, Florida.

   d. On or about October 2002, defendant Maria Eugenia Medina Milgrom, acting through Farma International, a corporate entity which she controlled, sold to various members of the conspiracy the excipients needed to manufacture counterfeit Lipitor and then caused the excipients to be shipped to a location in Costa Rica.

   e. On three separate occasions in November 2002, defendant Maria Eugenia Medina Milgrom, acting through Farma International, a corporate entity which she controlled, sold to various members of the conspiracy the excipients needed to manufacture counterfeit Lipitor and then caused the excipients to be shipped to a location in Costa Rica.

f. On or about January 2003, defendant Maria Eugenia Medina Milgrom, acting through Farma International, a corporate entity which she controlled, sold to various members of the conspiracy the excipients needed to manufacture counterfeit Lipitor and then caused the excipients to be shipped to a location in Costa Rica.

g. On or about March 2003, defendant Maria Eugenia Medina Milgrom, acting through Farma International, a corporate entity which she controlled, sold to various members of the conspiracy the excipients needed to manufacture counterfeit Zocor, Plavix, Viagra, and Bextra, and then caused the excipients to be shipped to a location in Honduras.

h. On or about April 2003, defendant Maria Eugenia Medina Milgrom, acting through Farma International, a corporate entity which she controlled, sold to various members of the conspiracy the excipients needed to manufacture counterfeit Zocor, Plavix, Viagra, and Bextra, and then caused the excipients to be shipped to a location in Honduras.

i. Between on or about October 2002 and February 2003, defendant Maria Eugenia Medina Milgrom, acting through Farma International, a corporate entity which she controlled, and at the direction of other members of the conspiracy, participated in the purchase from a St. Louis, Missouri area company of the punches and dies needed to manufacture counterfeit Zocor, Plavix, Viagra, and Bextra tablets.

j. Between on or about October 2002 and March 2003, various members of the conspiracy caused said punches and dies purchased from the St. Louis, Missouri area company to be shipped to Costa Rica via Miami, Florida.

k. On or about October and November 2002, various members of the conspiracy ordered and purchased counterfeit drug labels from a company in the greater Miami, Florida area, with the intent to misbrand the counterfeit, illegally imported, and diverted tablets by placing the counterfeit labels on bottles containing said tablets.

l. On or about November 18, 2002, in excess of $1.3 million that originated from Albers Medical Distributors, Inc., in the Western District of Missouri, was deposited into a bank account held in the name of Pharma Medical at a bank in Tennessee, which money represented proceeds from the sale of the counterfeit, misbranded, illegally imported, and diverted tablets by members of the conspiracy.

m. On or about November 27, 2002, in excess of $1.3 million that originated from Albers Medical Distributors, Inc., in the Western District of Missouri, was deposited into a bank account held in the name of Pharma Medical at a bank in Tennessee, which money represented proceeds from the sale of the counterfeit, misbranded, illegally imported, and diverted tablets by members of the conspiracy.

n. On or about December 9, 2002, in excess of $1.2 million that originated from Albers Medical Distributors, Inc., in the Western District of Missouri, was deposited into a bank account held in the name of Pharma Medical at a bank

in Tennessee, which money represented proceeds from the sale of the counterfeit, misbranded, illegally imported, and diverted tablets by members of the conspiracy.

  o. On or about December 11, 2002, in excess of $1.3 million that originated from Albers Medical Distributors, Inc., in the Western District of Missouri, was deposited into a bank account held in the name of Pharma Medical at a bank in Tennessee, which money represented proceeds from the sale of the counterfeit, misbranded, illegally imported, and diverted tablets by members of the conspiracy.

  p. On or about December 23, 2002, in excess of $2.1 million that originated from Albers Medical Distributors, Inc., in the Western District of Missouri, was deposited into a bank account held in the name of Pharma Medical at a bank in Tennessee, which money represented proceeds from the sale of the counterfeit, misbranded, illegally imported, and diverted tablets by members of the conspiracy.

  q. On or about January 9, 2003, in excess of $2 million that originated from Albers Medical Distributors, Inc., in the Western District of Missouri, was deposited into a bank account held in the name of Pharma Medical at a bank in Tennessee, which money represented proceeds from the sale of the counterfeit, misbranded, illegally imported, and diverted tablets by members of the conspiracy.

  r. On or about February 4, 2003, in excess of $1.2 million that originated from Albers Medical Distributors, Inc., in the Western District of Missouri, was deposited into a bank account held in the name of Pharma Medical at a bank

in Tennessee, which money represented proceeds from the sale of the counterfeit, misbranded, illegally imported, and diverted tablets by members of the conspiracy.

  s. On or about July 31, 2002, the members of the conspiracy used Pharma Medical to purchase in excess of $1.1 million worth of a genuine Lipitor product, manufactured for distribution in a South American country and not approved for sale in the United States, with the intent to illegally import the South American Lipitor into the United States.

  t. On or about August 27, 2002, the members of the conspiracy used Pharma Medical to purchase in excess of $1 million worth of a genuine Lipitor product, manufactured for distribution in a South American country and not approved for sale in the United States, with the intent to illegally import the South American Lipitor into the United States.

  u. On or about October 2, 2002, the members of the conspiracy used Lighthouse Investments to purchase in excess of $1.7 million worth of a genuine Lipitor product, manufactured for distribution in a South American country and not approved for sale in the United States, with the intent to illegally import the South American Lipitor into the United States.

  v. On or about October 25, 2002, the members of the conspiracy used an import and export company to purchase in excess of $3.2 million worth of a genuine Lipitor product, manufactured for distribution in a South American country

and not approved for sale in the United States, with the intent to illegally import the South American Lipitor into the United States.

  w.  On or about December 5, 2002, the members of the conspiracy used an import and export company to purchase in excess of $1.3 million worth of a genuine Lipitor product, manufactured for distribution in a South American country and not approved for sale in the United States, with the intent to illegally import the South American Lipitor into the United States.

  x.  On or about November 15, 2002, Albers Medical Distributors, Inc., using a bank account located within the Western District of Missouri, paid in excess of $1.4 million to purchase the counterfeit, misbranded, illegally imported, and diverted tablets from members of the conspiracy.

  y.  On or about November 26, 2002, Albers Medical Distributors, Inc., using a bank account located within the Western District of Missouri, paid in excess of $1.4 million to purchase the counterfeit, misbranded, illegally imported, and diverted tablets from members of the conspiracy.

  z.  On or about December 3, 2002, Albers Medical Distributors, Inc., using a bank account located within the Western District of Missouri, paid in excess of $1.4 million to purchase the counterfeit, misbranded, illegally imported, and diverted tablets from members of the conspiracy.

aa. On or about December 10, 2002, Albers Medical Distributors, Inc., using a bank account located within the Western District of Missouri, paid in excess of $1.4 million to purchase the counterfeit, misbranded, illegally imported, and diverted tablets from members of the conspiracy.

bb. On or about December 20, 2002, Albers Medical Distributors, Inc., using a bank account located within the Western District of Missouri, paid in excess of $2.2 million to purchase the counterfeit, misbranded, illegally imported, and diverted tablets from members of the conspiracy.

cc. On or about January 9, 2003, Albers Medical Distributors, Inc., using a bank account located within the Western District of Missouri, paid in excess of $2.1 million to purchase the counterfeit, misbranded, illegally imported, and diverted tablets from members of the conspiracy.

dd. On or about January 30, 2003, Albers Medical Distributors, Inc., using a bank account located within the Western District of Missouri, paid in excess of $1.3 million to purchase the counterfeit, misbranded, illegally imported, and diverted tablets from members of the conspiracy.

ee. On or about February 24, 2003, Albers Medical Distributors, Inc., using a bank account located within the Western District of Missouri, paid in excess of $1.6 million to purchase the counterfeit, misbranded, illegally imported, and diverted tablets from members of the conspiracy.

All in violation of Title 18, United States Code, Section 371.

Dated this 25th day of August 2005.

    *s/ Phillip Eugene Porter*
Phillip Eugene Porter
Senior Litigation Counsel

-13-

Case 4:05-cr-00298-ODS   Document 2   Filed 08/25/05   Page 13 of 13